ALBANY,
Dec. 1836.

Merritt
v.
Lyon.

MERRITT. & DYCKMAN, *appellants*, and MERRITT & LYON, *respondents.*

Where a suit at law is prosecuted, in the name of a third person, by a *receiver* appointed by the court of chancery, and the plaintiff and the defendant in the suit unite in a *petition* to the court of chancery, stating that the pretence under which the suit is prosecuted is *in fraud of justice*, that the object of the suit is to *vex*, *harass* and *oppress* the defendant, and to subject the plaintiff to costs, and the *allegations in the petition are not denied by the receiver* or by the party who procured his appointment, the *receiver* will be directed to discontinue the suit.

How far the court of chancery will interfere to *restrain* or *protect* a *receiver* in suits prosecuted by or against him, considered by Mr. *Justice* COWEN, who delivered the *prevailing* opinion, and by Mr. *Justice* BRONSON, who delivered a *dissenting* opinion.

APPEAL from chancery.    This was an appeal from an order of the chancellor directing a *receiver* to discontinue a suit at law prosecuted by him.    In May, 1816, Samuel Townsend and Monmouth Lyon gave a *sealed* note to Daniel Merritt for eight hundred and two dollars and fifty cents payable in twelve months, Lyon signing as the *surety* of Townsend.    In 1820, Daniel Merritt delivered the note to one *Jared Peck* for collection, and at the same time endorsed his name upon it, not for the purpose of transferring it to Peck, but to facilitate the collection.    The amount due upon the note was collected from Townsend by Peck, and he neglecting to pay over the money, Merritt sued him, and about 1825 recovered a judgment, which was compromised by Peck by the payment of a portion thereof.    The note, however, being in the hands of Peck's attorney, and being considered as of no value, was not delivered up to Merritt. More than seven years previous to 1834, Merritt considering Lyon discharged from his liability in consequence of indulgence given to Townsend without the assent of Lyon, and also in consequence of the property received by Peck from Townsend, formally *released* Lyon from all responsibility as maker of the note.    On the 13th October, 1834, an order was entered in the court of chancery in a cause in

which *Lot Merritt* was complainant, and *Jared Peck* and *Charles Bouton* were defendants, whereby, after reciting that the cause coming on to be heard upon the bill of complaint *taken as confessed,* and it appearing from the bill that the complainant had prayed that a *receiver* might be appointed to collect, receive, sell and dispose of all the estate, real and personal of the defendant *Jared Peck,* as well that part thereof which might be included in any assignment made by him to *Bouton* as otherwise, it was ordered on the motion of the complainant's counsel, and *with the assent of the defendant's counsel,* that *Jacob G. Dyckman* be appointed *receiver* with the usual powers. On the 26th October, 1834, a suit was commenced on the note given by Townsend and Lyon to Daniel Merritt in the name of Daniel Merritt against Lyon (Townsend being deceased) by the service of a declaration, and at the same time notice was served upon Lyon apprising him of the proceedings in chancery, and that the suit was brought *by the authority of the receiver.* A similar notice was served upon Daniel Merritt, and stating further that the suit was brought to recover the amount due upon the note which, it was alleged, was assigned or endorsed by Daniel Merritt to Jared Peck, and that as it was a *sealed note,* the suit could not be commenced in the name of Peck. On receiving these notices, Daniel Merritt and Lyon united in a petition to the chancellor, stating the above facts, averring that the pretence of an assignment or endorsement of the note was *in fraud of justice* and truth, that the suit was instituted and prosecuted by the procurement of Lot Merritt, and at his instigation, to *vex, harass* and *oppress* Lyon, and to injure Daniel Merritt, and *subject him to costs,* and praying that the *receiver* might be directed to desist from further proceedings in the suit, and that he or Lot Merritt be ordered to pay the costs of the defence of the suit, and of the petition. A copy of the petition was served upon the *solicitor* and *attorney* for *Lot Merritt* and for the *receiver,* together with notice of an intended application to the vice-chancellor of the first circuit for the relief prayed for in the petition. The petition was presented to the vice-chancellor. No answer or affidavits

in answer was put in by Lot Merritt or the receiver, but their solicitor and attorney attended the hearing and counsel opposed the granting of the petition. The vice-chancellor dismissed the petition, with costs to be paid to Lot Merritt.

The petitioners appealed to the chancellor, who *reversed* the order of the vice-chancellor, and directed the *receiver* to discontinue the suit at law, and perpetually enjoined him from prosecuting any suit on the note. He also ordered the receiver to pay to Lyon his costs of the defence, and directed the note to be delivered up to be cancelled. See the opinion of the Chancellor, 5 Paige, 125. From the order of the chancellor thus made, Lot Merritt and the receiver appealed to this court.

The case here was argued by

*M. T. Reynolds*, for the appellants.

*W. Silliman*, for the respondents.

The following opinions were delivered:

By Mr. Justice COWEN. On the argument of the appeal, it was very properly conceded that the chancellor had jurisdiction of the subject matter, the party and receiver, the latter being an officer of his court; and that the matter was properly brought forward by petition. And the only question which can arise is, whether the proofs before him furnished adequate grounds for the decree. There could in truth have been no pretence for the suit against *Lyon* The note had been paid, beside being barred by the statute of limitations and released. Moreover, it never belonged to *Peck*, the debtor. What there is of it, which is mere blank paper, still belongs to *Daniel Merritt*, who now joins the maker in a petition to stay the receiver from pursuing such a suit.

All this was correctly assumed by the chancellor, because it was directly charged and sworn to in the petition. That petition was served at an early day; and on

the hearing, neither *Lot Merritt* nor the receiver express their belief or suspicion that any one of the facts stated is unfounded. A knowledge of the facts in *Lot Merritt* or the receiver is not directly charged in the petition ; but both had full notice of them, at least from the time when the petition was served on their solicitor. Peck himself could say whether the note was ever assigned to him, or what other ground he had for claiming it as his property. The receiver or Lot Merritt had a right to explain. They had full time, or if not, the constant course of the court of chancery and every other court of record is, to allow the necessary time on proper cause being shown. If affidavits are not answered, they are taken as true.

There cannot be a doubt that had Lot Merritt and the receiver proceeded of their own head in the supreme court, they might have been sued by Lyon for the vexation ; I mean after having notice of such a defence as is here disclosed, and becoming conscious that the notice was true. And the court of chancery, after such notice, would become *particeps criminis* in allowing them to proceed under its sanction. It is the business of the receiver, whenever there is a serious doubt of the propriety of prosecuting a suit, to apply for direction ; and it is the constant course of the court to give or withhold its authority according to the circumstances ; and the cases cited by the chancellor show that he interferes to protect his receiver against suits at law. This is on the legal notion that the act of the receiver is either the act of the court or of its officer, who has perhaps run into an honest mistake. Jurisdiction is therefore claimed exclusively by the court, where his difficulties may be properly appreciated and his delinquency visited by a measure which no other court can accurately apply. It would be not only acting under a pretence of the authority of that court, as the chancellor expresses it, but much more than a pretence ; it would be by its indirect authority, if after notice a suit is allowed to preceed. It matters not whether the attention of that court be called to the subject by the receiver himself or by the party injured. It will be seen by the cases that the court has interfered

and stopped the receiver upon the ground of mere expediency. Having that power it is an insult to suppose the court would allow a suit to go on in the prosecution of which any man of common honesty would blush to be concerned. I speak of this matter as it appears, and as it must appear, until the parties implicated shall deign to give a reason for persisting in such a suit. I should be very sorry to suppose that a reason has been withheld upon any other consideration than a want of power in the court of chancery to demand it. I will not believe that any thing beside a desire to have that point settled, or at least a fastidiousness about giving "a reason upon compulsion," could ever have led to an appearance of such strange injustice. We all know that it must have been a mere distrust of his own powers which lead the vice chancellor of the first circuit to dismiss a petition for the restraint of a malicious prosecution. I must say, with the greatest deference to that learned functionary, I am clear he was too diffident of his jurisdiction.

A receiver is a creature of the court of chancery. He derives his very existence from an order which the chancellor may vacate at any time, directing him to account, or the order may hold him to his trust and compel him to exercise it properly. He is, in the case of a solicitor, punished with costs or even stricken from the roll for malpractice, or what the court verily believes to be so. Is he to be countenanced in an appeal to this court? Suppose he is found to be a common barrator, and punished for that. He abuses his office by stirring up litigation in such a suit as this appears to be, with a view to vex and harass his neighbor; shall this court, on appeal, decree that such a man shall not only remain upon the roll, but even be allowed to proceed unmolested, in despite of the very court by which he was created, and at whose will he holds his place? I doubt the power of *this court* to interfere in any aspect of such a case. It seems to me a mere case of discretion. All officers of court are bound to abide rules and orders; and it would lead to great insubordination should

one court undertake the office of interfering with another in the regulation of its servants. The supreme court orders a bail bond to be cancelled, and punishes the attorney with costs for having improperly put it in suit; was it ever thought that such an order was not final? Suppose the court of chancery to make a similar order on a solicitor, is that the subject of appeal? If Lot Merritt, or Peck, or Dyckman the receiver, wishes to enjoy a more perfect liberty in carrying on this suit on the paid note, they should have done so without placing the whole under the control of chancery. Every man may prosecute a vexatious action at his peril; but when he invokes the extraordinary aid of that court, and places the matter within its contol, he cannot complain that his independence is gone. How does the matter stand upon authority? It will be recollected that Daniel Merritt held the legal interest in the note upon which the receiver thought proper to institute a suit. It was not negotiable, and the suit was of course brought in Daniel Merritt's name. It was endorsed with his name in blank; but he swears that this was not for the purpose of transferring his right; and he is still the owner. It is not pretended that either Lot Merritt or Peck or Dyckman have any interest, legal or equitable. For aught that appears, the receiver might as well have prosecuted any other note or bond in the city which he could have laid his hands upon. What is the consequence to Daniel Merritt? The suit goes on in his name and his right; and he is defeated and subjected to an execution for costs whether he will or not.

I deny that a receiver has the least right to proceed in such a case without the previous sanction of the court. Where the legal estate is in another, and he is obliged to proceed in his name, even though the equitable right be in those whom the receiver represents, an order to prosecute must first be obtained, on notice to the person whose name is to be used. The person holding the real interest is then ascertained, and provision made to indemnify the nominal plaintiff. Such has been the settled doctrine ever since *Pitt* v. *Snowden*, 3 Atk. 750, before Lord Hardwicke, in

ALBANY,
Dec. 1836.

Merritt
v.
Lyon.

1752. The case arose on the right of receivers to distrain for rent due to the estate which they represented. His words are, " If there should be any doubt who had a legal right to the rent, then the receiver, as he must distrain in the name of the person who has the right, would very properly make an application to the court for an order," The case of *Hughes* v. *Hughes*, 3 Bro. C. C. 86, in 1790, went on the same distinction. 1 Ves. jr. 161, S. C ; and see *Shelly* v. *Pelham*, 1 Dick. 120. *Mitchel* v. *Duke of Manchester*, 2 id. 787. As late as 1821 the same doctrine was held, if the rent be in arrear for more than a year. *Brandon* v. *Brandon*, 5 Madd. 473. In 1825 in the exchequer a receiver proposed to sue for rent n the name of a trustee, who was abroad in Italy. The receiver was a solicitor ; and on inquiry it was not known how he came to be appointed concurrently with the trustee. The court refused to allow a prosecution which would be taking the whole power from the trustee and placing it in the hands of the solicitor. They said it was too great a power to be conferred on any professional person. *Della Cainea* v. *Hayward*, M'Clel. & Younge, 272. The case is in point. Here we do know, to be sure, how the solicitor came to be appointed. It was under an order by consent between him and the two persons in whose service he exhibits so much zeal. Neither the chancellor nor any of his masters, were consulted ; and what security he gave and whether any does not appear. Every thing passed by consent. They seem to have taken the court of chancery into their own hands ; and are determined to proceed in defiance of it. The case in the exchequer reported by M'Clel. & Younge, is reversed. It is no longer a question what power the court of chancery will confer on a solicitor ; but what power he and his clients will allow to the court of chancery.

In *Dacie* v. *John*, M'Clel. 575, the court held that they would not empower a receiver to sue for a debt, either where the suit would be oppressive to creditors or it was unlikely that any fruits would be derived from it. That is another case in point. Here the suit cannot but be oppressive to Daniel Merritt, by subjecting him to costs ; but all recovery,

all fruits are hopeless. Several cases of the like import are to be found in the Irish chancery. *Nangle* v. *Ld. Fingall,* 1 Hog. 142. *Ex parte Cornwallis,* id. 146.

It is no answer that Lot Merritt is a creditor of Peck, and that they are both anxious to prosecute the suit. There are other persons interested. In *Dacie* v. *John,* M'Clel. 206, 575, both had been partners, and a receiver was appointed to collect and take charge of their effects. The barons of the exchequer all concurred that the receiver should not be allowed to sue Longueville, a debtor, on the mere ground that he was solvent and had promised to pay in a reasonable time. Dacie, one of the partners, too, was anxious to sue ; but the barons thought that a reason, for preventing the suit. John, the other partner, opposed it. The case altogether proves that the whole of these matters lie in the merest discretion of the court of chancery ; as much so as an order giving time to answer.

I admit that the question before us depended on the good faith with which the suit was pursued ; and I have no doubt the chancellor so regarded it. Feeling greatly dissatisfied by such an unexplained case, for which I think he had much reason, he makes this decree ; but I am quite sure that never would have been, had the receiver, even after the delay of an appeal, opened his mouth to allege any excuse for the proceeding. The chancellor would have either heard the explanation himself or sent the papers back on a simple reversal, for answer before the vice chancellor. Not hearing a word, after so long a time, the receiver maintaining a sullen silence under full notice that there was no color for the suit in the supreme court, was leaving the case to the very harshest inferences against him. We are told that he had a right to throw himself on the presumption of his good faith and innocence. That was doubtless so, until the presumption should be overcome by opposing circumstances. Every man who is a party must then answer, and if he do not, his silence is construed into an admission.

The office of receiver, I am aware, is one of difficulty and responsibility ; and the court will extend to him every necessary encouragement and protection, and treat his con-

duct with great indulgence; but there is a limit to all this. He must at least, when properly called upon, show that he deserves indulgence. So far from being bound to lend himself to such a proceeding as this, he ought at once to have demanded from *Lot Merritt* and *Peck* an explanation, for his own satisfaction, if nothing more. He had the sworn case before him, and he ought not to have proceeded a step farther without taking the direction of the vice chancellor. Instead of doing so, he adopted the acts of *Lot Merritt*, with all their suspicious and dark coloring, when he resisted the motion on these papers.

On the whole, it seems to me the chancellor could say nothing less than that here is at least such evidence of bad faith as calls for explanation. I am entirely satisfied with the decree, including the costs. Indeed the latter is so much a matter of discretion, as hardly to be the subject of an appeal. I am for affirming the decree.

Chief Justice NELSON concurred in the opinion delivered by Mr. Justice *Cowen*.

Mr. Justice BRONSON *dissented* and delivered the following opinion:

If this case did not properly belong to a court of equity, the appellants were not called upon to say whether the allegations in the petition were either true or false. It was enough for them to object that the respondents had resorted to the wrong forum for relief, without saying what answer could be given to the application in another place. But for all the purposes of the inquiry whether this was a fit case for the interposition of the court of chancery, the allegations of the respondents must be taken to be true. What then are the questions presented by their petition? For the purpose of answering this inquiry I shall consider the case of each respondent separately. The one was obligor, and the other obligee in the instrument on which the action was founded— the one plaintiff and the other defendant in the suit. They had no common or joint interest, either legal or equitable,

which made it necessary for them to unite in the application; and if neither of them alone was entitled to relief, the case could not be made stronger by their both uniting in the petition.

First, as to *Daniel Merritt.* The suit in the supreme court was on a *sealed* note, and was therefore necessarily brought in the name of *Daniel Merritt,* the obligee. He had indorsed his name on the note and delivered it to *Peck ;* and among the choses in action of Peck, the receiver no doubt found the instrument. *Merritt,* the obligee, unites with Lyon, the obligor, in the various allegations showing that the note was no longer a valid security. They agree that *Lyon* was a surety for *Townsend,* and that the surety had been discharged by giving time to the principal debtor. They allege also that the debt had been collected from *Townsend,* and finally that *Merritt* had released and discharged *Lyon* from all liability on the note. *Merritt* adds that the note would have been given up to him at the time of the settlement with *Peck,* if he had regarded it of any value. Whether the note had been assigned to *Peck* or not, it is quite clear that *Merritt* had no interest in the instrument as a security : for the substantial reasons that the debt had been paid, and the obligor had also been released. He had no interest in the suit, either legal or equitable, and could have no possible right to interfere with its further prosecution, except for the single purpose of protecting himself against costs. As plaintiff on the record, costs would be adjudged against him if the defendant succeeded. He was entitled to an indemnity against those costs, and on an application to the court in which the action was pending, an ample indemnity would have been ordered as a matter of course. There was no occasion whatever for his resorting to a court of equity for relief, and I am not aware that a bill or petition has ever been entertained in such a case. It is true that *Merritt* unites with *Lyon* in the allegation that the pretence of an assignment to *Peck* is " in fraud of justice and truth and of the just rights of your petitioners ;" but it must be remembered that he had before shown that he had no " rights" whatever in relation to the matter. Whether the note had

been legally transfered to *Peck* or not, was a question in which *Merritt* could have no interest after his explicit admission that the instrument was no better than a piece of waste paper. The whole question then comes to this: Could *Merritt* resort to a court of equity for an indemnity against costs, when he had a certain, adequate and more expeditious remedy at law? I think it quite clear that he could not, and so far as he was concerned, the vice chancellor very properly dismissed the application.

It was said that if the suit was instituted in the name of *Merritt*, without any legal or equitable right to do so, he was not obliged to lie by and suffer it to proceed, even if an adequate indemnity should be tendered. This may be conceded; but then, what was his remedy? I agree with the chancellor, that the remedy was by application to the court in which the suit was instituted to stay the proceedings, and punish the person who had abused the process of the court. In a proper case, such redress would unquestionably be ordered; but it should come from the court in which the action was brought, and whose process had been improperly used. It did not furnish any ground for a suit or proceeding in a court of equity. And besides, if the suit was in truth instituted without any authority from Merritt, either express or implied, he could release the action, and thus put an end to it, without the necessity of resorting to any court. He not only had an adequate remedy at law, but also another remedy in his own hands, which did not require the aid of any judicial sanction. Why then should he resort to a court of equity? He was there for no legitimate purpose, except as a witness for *Lyon*. As an applicant for relief, his petition was properly denied by the vice chancellor.

What equity had *Monmouth Lyon?* It may be proper in the first place to notice an argument of the counsel which seems to have had some influence upon the decision of the chancellor. It was said that the receiver had been appointed by fraud and collussion between *Lot Merritt*, the judgment creditor, and *Peck*, the judgment debtor, for the purpose of prosecuting an action on the note in the name of *Daniel Merritt*, and in such a way as to deprive *Lyon* of

the benefit of his testimony. The decree made on the creditor's bill was referred to for the purpose of proving an improper combination between the parties to that suit. To this argument there are several answers. The alleged peculiarities in the decree on which the argument is based, are 1. That the parties agreed on the person who should be appointed receiver ; 2. He was not required to give security ; and 3. It was provided that if the receiver declined to prosecute any demand which *Peck* claimed as belonging to him, *Peck* might in that case apply to the court for leave to prosecute the claim on his own behalf. These alleged peculiarities in the order are very far from making out any thing like an improper combination between the parties to the chancery suit. They do not necessarily raise the inference that any friendly relations existed between them. When *Peck* could no longer resist the appointment of a receiver, it is not surprising that he should assent to the nomination of Mr. *Dyckman ;* and if all parties interested in the fund were satisfied with his individual responsibility, they might very properly waive the necessity of his finding sureties. As to the remaining ground of imputing fraud or collusion, if there were any choses in action claimed by *Peck* which the receiver should not deem it expedient to prosecute, either because the debtors were insolvent or for any other cause, what possible objection could there be to leaving such demands where they were before—under the control of *Peck ?* No good objection has been or can be suggested. And besides, the right to sue in such cases was not reserved to Peck unconditionally, but only the privilege of applying to the court for leave to prosecute on his own account. It is not to be presumed that leave would be improperly granted.

But there are other and more conclusive answers to this argument. The order of the court of chancery appointing a receiver on the creditors' bill could not be impeached or its legality called in question in this collateral manner. If third persons were in any way prejudiced by the order, they should make a direct application to the court to have it vacated or modified. Again, if the decree could be impeached in a collateral proceeding, it has not been done in

this case. The petition of the respondents says nothing whatever about any supposed fraud or combination; and it is hardly necessary to add that courts of equity as well as courts of law proceed *secundum allegata et probata.* If the party has proved more than he has alleged, he can only have relief according to the case which he has stated in his petition. In addition to all that has been said, it is morally impossible that there should have been any combination to deprive *Lyon* of the benefit of *Merritt's* testimony. The note was in the possession of *Peck,* and he could have brought an action upon it at pleasure, before the receiver was appointed. But whether brought by him or the receiver who took his place, the action must necessarily be brought in the name of *Daniel Merritt.* The receiver acquired no other or greater rights than such as had previously belonged to *Peck,* and if there was any combination between the parties to the chancery suit, it was one of the most idle and worthless contrivances that could possibly be imagined.

The facts alleged by *Lyon* as a foundation for his application were, 1. that the note was not assigned to *Peck,* and consequently the receiver had no right to sue; 2. that he had three good defences to the suit at law; and 3. that the action was prosecuted by the procurement of *Lot Merritt,* the judgment creditor, and at his instigation, to the vexation of the petitioner, and unjustly to harass and oppress him. The alleged vexation and oppression may be regarded as an inference from the previous statements, or a complaint rather than the substantive allegation of a fact. But it is not very important in which light it is considered. No one of the facts alleged, nor all of them taken together, furnish a sufficient ground for a bill in equity. If the note did not belong to *Peck,* the action could be released by *Daniel Merritt,* the plaintiff on record. He was ready to second the wishes of *Lyon,* as is abundantly proved by his joining in the petition. If his name was improperly used as plaintiff, to the vexation or oppression of *Lyon,* a ready and an adequate remedy could be had by applying to the

court in which the action was pending. There was no occasion for resorting to another forum. The fact that he had a good defence at law was the worst of all reasons for resorting to the court of chancery. It was the very reason which would deprive that court of jurisdiction. He did not ask a discovery in aid of his defence at law nor set up any other ground of equity as the foundation for his application.

It was said that the note ought to be delivered up and cancelled, and *Hamilton* v. *Cummings*. 1 Johns. Ch. R. 517. was referred to as proving the jurisdiction of the court of chancery in such cases. There is no doubt of the power of that court, in a fit case and on a proper application, to order an instrument to be delivered up to be cancelled. But the respondents neither made out a proper case for such an application, nor did they pray any such relief. The prayer of the petition was for an order that the receiver desist from further proceedings on the note, and that *Lyon* be paid his costs in the supreme court, and the petitioners their costs in this matter. Under the circumstances of this case I doubt whether the party was entitled to any other or different relief under the *general prayer* which was added. Looking at the specific prayer of the petitioners, the appellants might be willing to rest the case on the question of law which it presented, without offering any answer to the facts alleged. But if there had been a prayer that the note should be delivered up to *Lyon*, they might then have denied the allegations contained in the petition.

But independent of this consideration, I am of opinion that the respondents did not make out a proper case for asking that the note should be delivered up to be cancelled. I shall not go over with the cases on this head of equity jurisdiction. Many of them were examined by Chancellor Kent, in *Hamilton* v. *Cummings*. He concluded his review with the remark, that while he asserted the authority of the court to sustain such bills, he was not to be understood as encouraging applications where the fitness of the exercise of the power of the court was not pretty strongly displayed. He added, " perhaps the cases may all be re-

ALBANY,
Dec. 1836.

Merritt
v.
Lyon.

conciled on the general principle that the exercise of this power is to be regulated by sound discretion, as the circumstances of the individual case may dictate; and that the resort to equity, to be sustained, must be expedient, either because the instrument is liable to abuse from its negotiable nature, or because the defence, not arising on its face, may be difficult or uncertain at law, or from some other special circumstances peculiar to the case, and rendering a resort here highly proper, and clear of all suspicion of any design to promote expense and litigation." Although the rule laid down by Chancellor Kent goes further in asserting the jurisdiction of the court than some of the cases in England, the respondents have not brought themselves within it. The instrument was not negotiable, and there could be no danger of abuse on that ground. It is not alleged that the defence is either difficult or uncertain at law, nor are there any special circumstances why the rights of the parties should not be settled at law, where the question is pending. There is nothing peculiar in the case except that *Lyon* has three good defences at law to the action, while other defendants do not usually have more than one. This is not a peculiarity that can render a resort to equity either necessary or proper. If the respondents can succeed under this head of equity jurisdiction, many litigated questions on written instruments may be transferred from courts of law to the court of chancery. Whenever the defendant is able to make the usual affidavit of merits on the ground that the instrument is void, or that the debt has been paid or released, he may withdraw the case from a trial by jury, and involve the opposite party in all the difficulty and expense of a litigation in chancery. In *Tranco* v. *Bolton*, 3 Ves. 368, a bill of this kind was dismissed on demurrer, on the ground that the matter alleged in avoidance of the bond might be pleaded at law. There is no doubt that the court of chancery, under special and peculiar circumstances, will order an instrument to be delivered up, although there is a good defence at law; but it is believed that there is no case which goes the length of asserting that a defendant sued at law may avoid a trial by jury, and transfer the cause to an-

other forum on the naked allegation that he has a good defence. Such a doctrine cannot be maintained.

The only remaining ground which has been urged in favor of entertaining the petition is, that the receiver is an officer of the court of chancery, and subject to its control in the exercise of his authority. That a receiver is an officer of the court of chancery cannot be questioned ; nor can it be denied that he is subject to the general supervision of the court for all the purposes of protecting the fund which is committed to his charge. But I do not think it equally clear that the court can interfere with the receiver merely on the ground that he is its officer, so long as he acts within the scope of his authority, and does nothing prejudical to those who may be interested in the fund. Cases were cited for the purpose of proving that the court of chancery will protect its officers, and will restrain third persons from commencing actions at law against them, even where they had exceeded their authority. In *Nugent* v. *Nugent*, 2 Molloy, 372, where a man was discharged from custody who had been improperly arrested on an attachment sued out by a receiver, the *Master of the Rolls* said it was unnecessary to require an undertaking not to bring an action; and he added, " compensation can only be got in this court for any misuse of its process. I will enjoin against such actions brought in common law courts." In *Froud* v. *Lawrence*, 1 Jac. & Walk. 635, the party had been arrested on an attachment improperly issued by the receiver, and after the attachment had been set aside for irregularity, he brought an action at law to recover damages for the illegal arrest. The chancellor granted an injunction to stay the suit, but without prejudice to any application which the plaintiff might make in the court of chancery for compensation. See also *Ex parte Clarke*, 1 Rus. & Mylne, 563 ; *Aston* v. *Heron*, 2 Mylne & Keene, 398. Smith (office of receiver) 104, *note*, says, " the court of chancery will not allow an action to be brought for a *false arrest* under an attachment ; the practice being to refer it to a *master* to ascertain what compensation shall be made to the injured party." Whether this doctrine is not a little

too strong for our notions of the right of trial by jury need not now be considered. Although the English court of chancery has gone very far in protecting its officer where he has transgressed his authority, it does not follow that it will interfere to the same extent for the purpose of controlling and punishing the officer, where he has neither overstepped the boundary of his power, nor done any act injurious to those whose interest he is appointed to protect.

A receiver is a person standing indifferent between the parties, who is appointed by the court of chancery to take the charge and management of the property in controversy for the benefit of the person who may ultimately be entitled to it. The possession of the receiver is sometimes deemed the possession of the party in interest. *Sharp* v. *Carter*, 3 P. Williams, 379. For most purposes, however, the possession of the officer is considered the possession of the court, and third persons will not be allowed to disturb the tenants after they have attorned to the receiver, nor will they be permitted to bring ejectment to recover the property without obtaining leave from the court of chancery. *Wardle* v. *Lloyd*, 2 Molloy, 388. *Angel* v. *Smith*, 9 Ves. 335. When the court has taken the property under its charge, it will not suffer the fund to be wasted by unnecessary actions at law between persons who may set up conflicting claims ; but will adopt the proper means for adjusting the whole controversy. It is on the same principle of protecting and preserving the fund that the court will control the receiver in the exercise of his authority, and prevent him from doing any act which may prejudice the right of the person beneficially interested in the property. But the case under consideration is very far from falling within this principle. The receiver is not attempting to dissipate but to acquire the fund. He finds among the choses in action of *Peck*, the judgment debtor, a note which apparently belongs to him, and takes the necessary means to collect the money for the benefit of the judgment creditor. So far is this from being an act prejudicial to the judgment creditor—the person entitled to the fund when collected—that the very complaint in the petition is, that

ALBANY,
Dec. 1836.

Merritt
v.
Lyon.

the suit was instituted "by the procurement of *Lot Merritt,* and at his instigation." To interfere and stop the receiver in such a case is to defeat the end and object for which he was appointed.

Whether the note had been assigned to Peck or not is a question between the receiver and *Daniel Merritt.* But if *Lyon* has any right to be heard on that subject, an ample remedy may be had in the court where the action is pending. What, then, is *Lyon's* case ? It is nothing more than this— he says he does not owe the debt, and for that reason he wishes the court of chancery to interfere summarily and stop the suit. It is a sufficient answer to such an application, in whatever court it may be made, that whether he owe the debt or not is a question to be tried in the forms prescribed by law, and not by affidavits. The fact, that the person who brings or controls the suit is a receiver, cannot alter the case. He is the representative of the persons beneficially interested in the fund, and so long as they do not complain, and especially where they insist that he shall proceed, I can perceive no possible reason for restraining the prosecution. The defendant in the action is entitled to no extraordinary privilege on the mere ground that the suit is under the direction of an officer of the court of chancery.

In the argument, much stress was laid on the fact that the receiver had not denied the statements contained in the petition. I think there was no occasion for a denial on his part. It was enough for him to take the objection that *Lyon* could not withdraw the question of indebtedness from the decision of a jury, and transfer it to another forum, without setting up some specific ground of equity jurisdiction. But what was there for the receiver to deny ? On a careful examination of the petition, it will be found that *it does not contain a single allegation of misconduct, or want of good faith on the part of the receiver.* It alleges that *Lot Merritt,* the judgment creditor, served the declaration, and that he also served the notice which stated that the note had been assigned to *Peck.* The petition then states that the pretence of an assignment is "in fraud of

justice and truth," but it contains no intimation that the receiver knew any thing about the matter, either the one way or the other. *Lyon* also complains that he is vexed and oppressed by the suit, but he imputes no improper act or motive to the receiver. He does not allege that the receiver ever knew, or had been informed, or that he had any reason to believe that the matters set up in the petition were true. What then was there for the receiver to answer? If he had put in an affidavit stating that the suit was commenced in the honest belief that he should be able to recover, and that he still entertained that opinion, all must agree that the application ought in that case, to have been denied. He was not bound to make such an affidavit for two reasons; in the first place, bad faith in bringing or prosecuting the action was not imputed to him, and no man can be required to vindicate his motives until they have been impeached. Another reason is, that the plaintiff in an action at law cannot be called into a court of equity for the mere purpose of asking him whether he expects to recover if the suit is suffered to proceed. There is no such head of equity jurisdiction.

I entertain no doubt that a receiver who uses his power oppressively may be restrained within proper limits, or removed from his trust by the court which appointed him. But it does not follow that this should be done upon mere suspicion, and without a distinct allegation of the fact of misconduct. The party who resorts to a court of equity for relief must state his case—must show some proper ground for putting the court in motion. If he has a complaint to make against an officer or any other person, he must state what the complaint is—must show that wrong has been done or is impending. The matter must be plainly alleged, and not left to be made out by argument and inference. Until this is done, his adversary is not bound to answer. The law does not presume guilt against any man; and yet we are asked to grant relief against this receiver, and charge him with the costs of a chancery suit without the distinct imputation of any fault on his part. The strongest argument against him amounts only to this

—he has not volunteered a denial of that which has never been laid to his charge.

It seems from the argument to be supposed that the receiver has arrayed himself in hostility to the power from which he derived his appointment, and committed a contempt of the court of chancery. I am utterly unable to discover any thing in the case to warrant this view of the subject. The receiver was served with a petition which charged him with no fault. If the respondents had suffered any wrong, there was no pretence that the receiver was a party to it, or that he either knew or had any cause to suspect the injustice. The receiver thereupon went before the vice-chancellor, from whom he received his appointment, and in effect, inquired of the court whether there was any thing in the petition which he was bound to answer. This certainly wasnot disrespectful to the vice-chancellor, nor did it evince any thing like a spirit of insubordination. The vice-chancellor could perceive nothing wrong in the matter. He told the receiver there was nothing for him to answer—that the application was without foundation ; and he immediately dismissed the petition with costs.

If the vice-chancellor had suggested a doubt whether the receiver was not called upon to speak, it can hardly be questioned that he would have stated the ground upon which the suit was instituted, although I think it would have been wholly unnecessary to do so. But he was, in effect told, that he need not trouble himself with a denial, until some wrong was charged against him.

The respondents then appealed to the chancellor, where the question was necessarily the same as it had been before the vice-chancellor. The receiver could not have supposed that he was contemning the power of the court by again insisting that the respondents had made out no case for asking relief. He learned, however, from the decree that he had been much in fault. He was not only directed to abandon the suit at law, but he was charged with the costs of the action, and all the costs before the vice-chancellor, and on the appeal.

I am of opinion that the vice-chancellor made the proper disposition of this case, and that the decree of the court of chancery should be reversed.

On the question being put, *Shall this decree be reversed?* the members of the court voted as follows:

*In the affirmative*—The PRESIDENT of the Senate, Mr. *Justice* BRONSON and *Senators* FOX, GRIFFIN, and MACK.

*In the negative*—The CHIEF JUSTICE, Mr. *Justice* COWEN and *Senators* ARMSTRONG, J. BEARDSLEY, L. BEARDSLEY, BECKWITH, DOWNING, EDWARDS, HUNTER, GANSEVOORT, J. P. JONES, LOOMIS, LOUNSBERRY, MAISON, SEGER, SPRAKER, STERLING, and WILLES.

Whereupon the decree of the chancellor was accordingly *affirmed.*